# EXHIBIT   A

**BEFORE THE JUDICIAL PANEL**
**ON MULTIDISTRICT LITIGATION**

| | | |
|---|---|---|
| IN RE:<br>STANFORD ENTITIES SECURITIES<br>LITIGATION | ) ) ) ) ) | MDL Docket No. 2099 |

## NOTICE OF RELATED ACTIONS

Pursuant to the Rule 7.5 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation and the instructions of the office of the Clerk of the Panel, Pershing LLC ("Pershing") hereby provides notice of two potential "tag-along" actions pending against it in federal district court that are related to the actions subject to the motion to transfer pursuant to 28 U.S.C. § 1407 pending before the Panel in the above-captioned proceeding.

  1. *Wampold et al.* v. *Pershing, LLC et al.* was filed in the 19th Judicial District for the Parish of East Baton Rouge, State of Louisiana, Case No. C 577,629, Division D, on April 24, 2009. The action was removed to the United States District Court for the Middle District of Louisiana on May 29, 2009, and is now styled as Civil Action No. 09-cv-323. The action was consolidated with two other actions, *Becker et al.* v. *Green et al.*, Civil Action No. 09-cv-226, and *Starkey et al.* v. *Green et al.*, Civil Action No. 09-cv-265, on June 24, 2009. Although there are several common defendants named in the *Becker* and *Starkey* actions, Pershing is not a defendant in those actions. *Wampold* is assigned to Judge James J. Brady and

Magistrate Judge Docia L. Dalby.  A courtesy copy of the complaint is attached hereto as Exhibit A.

2.      *Turk, individually, as Trustee of the Lynne Caponera Revocable Trust, and on behalf of all others similarly situated* v. *Pershing, LLC*, a putative class action, was filed in the Circuit Court of the Judicial Circuit, in and for Palm Beach County, Florida, Case No. 50 2009 CA 024830, on July 23, 2009.  The action was removed to the United States District Court for the Southern District of Florida on August 25, 2009, and is now styled as Civil Action No. 09-cv-81236.  The action is assigned to Judge Kenneth A. Marra and Magistrate Judge Linnea R. Johnson.  A courtesy copy of the complaint is attached hereto as Exhibit B.

Pershing respectfully submits that these actions involve common questions of fact with the actions that are the subject of the Section 1407 motion to transfer pending before the Panel in the above-captioned proceeding and should be considered "tag-along" actions pursuant to Rule 7.5(d) of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation.

Dated:  August 26, 2009

Respectfully submitted,

Richard C. Pepperman, II
Jeffrey J. Chapman
Stephen Ehrenberg
SULLIVAN & CROMWELL
125 Broad Street
New York, New York 10004
(212) 558-4000

*Attorneys for Pershing, LLC*

**BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

IN RE:                                           )
STANFORD ENTITIES SECURITIES                     )      MDL Docket No. 2099
LITIGATION                                       )
                                                 )

---

**PROOF OF SERVICE**

---

I hereby certify that on August 26, 2009, I caused a true and correct copy of

Pershing's Notice of Related Actions and the exhibits thereto to be served via first class mail,

postage prepaid, on the counsel and parties identified in the attached Panel Service List and on

counsel for movants, Richard A. Speirs, ZWERLING, SCHACHTER & ZWERLING, LLP.

The following counsel for plaintiffs in the actions captioned *Wampold et al.* v.

*Pershing, LLC et al.*, Civil Action No. 09-cv-323, United States District Court for the Middle

District of Louisiana, and *Turk, individually, as Trustee of the Lynne Caponera Revocable Trust,*

*and on behalf of all others similarly situated* v. *Pershing, LLC,* Civil Action No. 09-cv-81236,

United States District Court for the Southern District of Florida, were served via Federal

Express:

**Counsel for _Wampold et al._:**

James R. Swanson
FISHMAN, HAYGOOD, PHELPS, WALMSLEY, WILLIS & SWANSON LLP
201 St. Charles Ave.
46th Floor
New Orleans, LA 70170

**Counsel for _Turk_:**

James W. Beasley, Jr.
BEASLEY HAUSER KRAMER LEONARD & GALARID, P.A.
505 South Flagler Drive, Suite 1500
West Palm Beach, Fla. 33401

Dated:  August 26, 2009

Respectfully submitted,

Richard C. Pepperman, II
Jeffrey J. Chapman
Stephen Ehrenberg
SULLIVAN & CROMWELL
125 Broad Street
New York, New York 10004
(212) 558-4000

_Attorneys for Pershing, LLC_

08/19/2009 09:41 FAX  202 502 2888        JPML                            ☑002/006

Printed on 08/19/2009

# Judicial Panel on Multidistrict Litigation - Panel Service List
## for
## MDL 2099 - IN RE: Stanford Entities Securities Litigation

### *** Report Key and Title Page ***

Please Note: This report is in alphabetical order by the last name of the attorney. A party may not be represented by more then one attorney. See Panel rule 5.2(c).

**Party Representation Key**
 * Signifies that an appearance was made on behalf of the party by the representing attorney.
 # Specified party was dismissed in some, but not all, of the actions in which it was named as a party.
 All counsel and parties no longer active in this litigation have been suppressed.

**This Report is Based on the Following Data Filters**
 Docket: 2099 - Stanford Entities SEC
 For Open Cases

**Judicial Panel on Multidistrict Litigation - Panel Service List**                          Page 1

Docket: 2099 - IN RE: Stanford Entities Securities Litigation
Status:  Pending on  / /
Transferee District:       Judge:                                            Printed on 08/19/2009

| ATTORNEY - FIRM | REPRESENTED PARTY(S) |
| --- | --- |
| Pendergest-Holt, Laura<br>c/o Stanford Group Company<br>5050 Westheimer Road<br>Houston, TX 77056 | =><br>Pendergest-Holt, Laura |
| Baranoucky, Amy S.<br>4295 Columbine Drive<br>Unit 8<br>Vail, CO 81657-4767 | =><br>Baranoucky, Amy S. |
| Blue, Gregory A.<br>MORGENSTERN & BLUE LLC<br>885 Third Avenue<br>New York, NY 10022 | =>Phone: (212) 750-6776  Fax: (212) 208-6874  Email: gblue@mfbnyc.com<br>Bell, Jon A.*; Bornstein, Jaime Alexis Arroyo*; Bukrinsky, Samuel*; Frank, Joan Gale*; Olano, Juan C.*; Rotstain, Peggy Roif*; Wade (Trustee-the Microchip ID Systems, Inc. Retirement Plan), John* |
| Comeaux, Jay<br>c/o Stanford Group Company<br>5050 Westheimer Road<br>Houston, TX 77056 | =><br>Comeaux, Jay |
| Commonwealth of Antigua,<br>Attorney General & Minister of Legal Affairs<br>Office of the Attorney General & Ministry of Legal<br>Government Complex - Queens Elizabeth Hwy<br>St. John's, Antigua | =><br>Commonwealth of Antigua & Barbuda (The) |
| Cooper, Samuel<br>BAKER BOTTS LLP<br>910 Louisiana Street<br>Houston, TX 77002 | =>Phone: (713) 229-1834  Fax: (713) 229-2734  Email: samuel.cooper@bakerbotts.com<br>Janvey, Ralph S.* |
| Finn, David<br>MILNER & FINN<br>2828 North Harwood Street<br>Suite 1950<br>LB 9<br>Dallas, TX 75201 | =><br>Davis, James M. |
| Fleming, George M.<br>FLEMING & ASSOCIATES LLP<br>1330 Post Oak Boulevard<br>Suite 3030<br>Houston, TX 77056 | =>Phone: (713) 621-7944  Fax: (713) 621-9638  Email: george_fleming@fleming-law.com<br>Adams, Jerry*; Edrington, Jerry*; Gomez, Ben*; Hicks, Michael* |
| Foster, Bradley W.<br>ANDREWS KURTH LLP<br>1717 Main Street<br>Suite 3700 | =>Phone: (214) 659-4646  Fax: (214) 915-1407  Email: bradfoster@andrewskurth.com<br>Bowen, Miclette & Britt, Inc.* |

Note: Please refer to the report title page for complete report scope and key.

08/19/2009 09:41 FAX  202 502 2888          JPML                                    ☒004/006

*(Panel Attorney Service List for MDL 2,099 Continued)*                             Page 2

| ATTORNEY - FIRM | REPRESENTED PARTY(S) |
|---|---|

Dallas, TX 75201

Green, Jason                                    => 
c/o Stanford Group Company                          Green, Jason
5050 Westheimer Road
Houston, TX 77056

Hamel, Charles Leland                           =>Phone: (713) 869-0557  Fax: (713) 869-0677  Email: lhamel@bbctrial.com
HAMEL BOWERS & CLARK LLP                            Winter, Robert S.*
5300 Memorial Drive
Suite 900
Houston, TX 77007-8201

Homer, Peter W.                                 =>Phone: (305) 350-5100  Fax: (305) 372-2738  Email: phomer@homerbonner.com
HOMER & BONNER PA                                   Ranni, Reinaldo*
1200 Four Seasons Tower
1441 Brickwell Avenue, Suite 1200
Miami, FL 33131

Kirtley, III, John T.                           =>Phone: (214) 521-4412
FERRER POIROT & WANSBROUGH                          Ginio, Nicole; Nemer, Cesar; Nemer, Hamad
2603 Oak Lawn Avenue
Suite 300
Dallas, TX 75219

Malouf, Stephen F.                              =>Phone: (214) 969-7373  Fax: (214) 969-7648  Email: smalouf@smalouf.com
LAW OFFICES OF STEPHEN F MALOUF PC                  Hernandez, Larry*
3811 Turtle Creek Blvd.
Suite 1600
Dallas, TX 75219

Norman, Richard E.                              =>Phone: (713) 651-1771
CROWLEY NORMAN LLP                                  Cohron, John
Three Riverway
Suite 1775
Houston, TX 77056

Pendley, Patrick W.                             =>Phone: (504) 687-6396  Fax: (504) 687-6398  Email: pwpendley@pbclawfirm.com
PENDLEY BAUDIN & COFFIN LLP                         Allen, Sandra C.
P.O. Box 71
24110 Eden Street
Plaquemine, LA 70765

Polkes, Jonathan D.                             =>Phone: (212) 310-8000  Fax: (212) 310-8007  Email: jonathan.polkes@weil.com
WEIL GOTSHAL & MANGES LLP                           Willis of Colorado, Inc.*
767 Fifth Avenue
New York, NY 10153

Robbins, Darren J.                              =>Phone: (619) 231-1058  Fax: (619) 231-7423  Email: darrenr@csgrr.com
COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP          Kyle, James O.
655 West Broadway

Note: Please refer to the report title page for complete report scope and key.

*(Panel Attorney Service List for MDL 2,099 Continued)*                                          Page 3

| ATTORNEY - FIRM | REPRESENTED PARTY(S) |
| --- | --- |
| Suite 1900<br>San Diego, CA 92101 | |
| Snyder, Edward C.<br>CASTILLO SNYDER PC<br>300 Convent Street<br>Suite 1020<br>San Antonio, TX 78205 | ⇒>Phone: (210) 630-4200  Fax: (210) 630-4215  Email: esnyder@casnlaw.com<br>Diaz, Martha*; Gilly-Flores, Paula*; Punga Punga Financial, Ltd.*; Troice, Samuel* |
| Speirs, Richard A.<br>ZWERLING SCHACHTER & ZWERLING LLP<br>41 Madison Avenue<br>New York, NY 10010 | ⇒>Phone: (212) 223-3900  Fax: (212) 371-5969  Email: rapeirs@zsz.com<br>Amann, Ute*; Dargham, Fawzi Ale*; Edgecomb, Michael*; Neto, Italo Belon*; Palacios, Christian* |
| Stanford, R. Allen<br>c/o Stanford Group Co.<br>5050 Westheimer Road<br>Houston, TX 77056 | ⇒><br>Stanford, R. Allen |
| Stanford Capital,<br>Attn:  Legal Counsel<br>5050 Westheimer Road<br>Houston, TX 77056 | ⇒><br>Stanford Capital Management, LLC |
| Stanford Financial Group,<br>Attn: Legal Counsel<br>701 Brazos Street<br>Suite 1050<br>Austin, TX 78701 | ⇒><br>Stanford Financial Group; Stanford Financial Group Co.; Stanford Financial Group Global Management LLC |
| Stanford Group Co.,<br>Attn: Legal Counsel<br>5050 Westheimer Road<br>Houston, TX 77056 | ⇒><br>Stanford Group Co. |
| Stanford Group Venezuela,<br>Attn: Legal Counsel<br>Avenida Tamanaco<br>Centro Empresarial el Rosal, Piso3<br>Caracas, Venezuela | ⇒><br>Stanford Group Venezuela Asesores De Inversion CA |
| Stanford Holdings, Inc.,<br>Attn: Legal Counsel<br>5050 Westheimer Road<br>Houston, TX 77056 | ⇒><br>Stanford Group Holdings, Inc.; Stanford Holdings, Inc. |
| Stanford Int'l Bank,<br>Attn: Legal Counsel<br>No. 11 Pavilion Drive<br>P.O. Box 3300<br>St. John's Antigua, West Indies | ⇒><br>Stanford International Bank, Ltd. |

Note: Please refer to the report title page for complete report scope and key.

08/19/2009 09:41 FAX    202 502 2888          JPML                                  ☑ 006/006

· *(Panel Attorney Service List for MDL 2,099 Continued)*                                                  Page 4

| ATTORNEY - FIRM | REPRESENTED PARTY(S) |
|---|---|
| Stanford Venture Capital, Attn: Legal Counsel 5050 Westheimer Road Houston, TX 77056 | ⇒ Stanford Venture Capital Holdings, Inc. |
| Willis Group Holding Ltd., c/o Appelby Canon's Court 22 Victoria Street Hamilton Bermuda | ⇒ Willis Group Holdings Ltd. |

Note: Please refer to the report title page for complete report scope and key.

# Exhibit A





19th JUDICIAL DISTRICT FOR THE PARISH OF EAST BATON ROUGE
STATE OF LOUISIANA



No. 577629                                                   Div

MILFORD WAMPOLD, III; WAMPOLD & COMPANY, INC.; MILFORD
WAMPOLD SUPPORT FOUNDATION; KENNETH BIRD; TERESA LAMKE;
ANTONIO CARRILLO; MARIA CARRILLO; HERMAN THIBODEAUX

versus

PERSHING, LLC; CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON IN
SYNDICATES 2987, 2488, 1866, 1084, 1274, 4000 & 1183; JASON GREEN;
JOHN SCHWAB; RONALD CLAYTON; HOPE BELLELO;
CHARLES JANTZI; TIFFANY ANGELLE; ABC INSURANCE COMPANY;
XYZ INSURANCE COMPANY

FILED: _____        _____
                                                  DEPUTY CLERK

## PLAINTIFFS' ORIGINAL PETITION

NOW INTO COURT, through undersigned counsel come Plaintiffs, Milford Wampold,

III; Wampold & Company, Inc.; Wampold Companies; Milford Wampold Support Foundation;

Kenneth Bird; Teresa Lamke; Antonio Carrillo; Maria Carrillo; and Herman Thibodeaux who

respectfully represent as follows:

1.

Jurisdiction and venue are proper in accordance with the provisions of the Louisiana

Code of Civil Procedure.

2.

Plaintiffs bring this action against both the Defendants and their insurers pursuant to the

Louisiana Direct Action Statute (LA. REV. STAT. §22:1269(B)).

3.

Made Defendants in this case are the following parties:

a. **PERSHING, LLC,** a single member Delaware Limited Liability Company.



265706v.2

b. **CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON IN SYNDICATES 2987, 2488, 1866, 1084, 1274, 4000 & 1183.** Defendants are citizens of the United Kingdom. Per the service of suit clause in the policy of insurance, this Defendant may be served with the petition and citation by serving Mendes & Mount, 750 Seventh Avenue, New York, NY 10019-6829.

c. **STANFORD GROUP COMPANY BROKERS ("SGC BROKERS"):**

  i. **JASON GREEN,** a person of full age and majority residing in Baton Rouge, Louisiana.

  ii. **RONALD CLAYTON,** a person of full age and majority residing at 2621 Cedar Lodge Drive, Baton Rouge, Louisiana, 70809.

  iii. **HOPE BELLELO,** a person of full age and majority residing at 8434 Tina Lane, Maringouin, Louisiana 70757.

  iv. **CHARLES JANTZI,** a person of full age and majority residing at 723 Troutbeck Drive, Baton Rouge, Louisiana 70810.

  v. **JOHN SCHWAB,** a person of full age and majority residing at 2446 June St., Baton Rouge, Louisiana 70808.

  vi. **TIFFANY ANGELLE,** a person of full age and majority residing at 403 Boulder Creek Parkway, Lafayette, Louisiana 70508.

d. **ABC INSURANCE COMPANY,** the insurance company or companies that provide commercial general liability insurance to the Broker defendants.

e. **XYZ INSURANCE COMPANY,** the insurance company or companies that provide insurance to Pershing.

## OVERVIEW

4

A large-scale financial catastrophe came to light in January 2009, when the SEC brought an enforcement action and had a receiver appointed for the Stanford Group Companies in the matter captioned *Securities and Exchange Commission v. Stanford International Bank, Ltd., et al.* No. 3:09-cv-0298-N in the United States District Court for the Northern District of Texas. The SEC has indicated that it believes that the Stanford Group Companies were conducting a

Ponzi scheme, but it is not clear whether some or all of the brokers had knowledge of it. Ultimately, however, they bear the responsibility for it.

5.

The Plaintiffs in this case are residents of Louisiana who purchased investment products sold to them by the individual broker defendants who were affiliated and registered with the Stanford Group Company. The primary investment products that the Plaintiffs complain about herein are certificates of deposit issued by the Stanford International Bank ("SIB CDs").

6.

The Stanford International Bank ("SIB") and numerous other related entities are owned by R. Allen Stanford. A significant purpose of these related entities was to serve as sales agents for the SIB CDs. Among these related entities were the Stanford Group Company and the Stanford Trust Company.

7.

SIB purported to be a private international bank domiciled in St. John's, Antigua, West Indies. SIB claimed to serve tens of thousand of clients in over 100 countries, managing assets of nearly $8 billion. SIB claimed that it generally did not loan money. Instead, SIB's model was to sell SIB CDs to U.S. investors through SGC, its affiliated investment adviser, and use the money to make investments that would pay the offered rate of return on the CDs. SIB then purportedly invested the money in a suitably liquid portfolio of assets.

8.

SGC is registered with the Securities and Exchange Commission ("SEC") as a broker-dealer and investment adviser. It has offices throughout the U.S., including two offices in Louisiana – in Baton Rouge and Lafayette. SGC's principal business consisted of the sale of SIB CDs. SGC is a wholly-owned subsidiary of Stanford Group Holdings, Inc., which in turn is owned by R. Allen Stanford.

9.

For years, the Stanford Group Companies recruited successful registered representatives from other brokerage firms to join the Stanford organization. It did so, in part, by offering an above-market performance-based compensation arrangement. A centerpiece of this arrangement was the generous, above-par commission paid in connection with the sale of certificates of deposit issued by Stanford International Bank. SGC received a 3% trailing fee from SIB on sales

of SIB CDs by SGC advisors. SGC advisors received a 1% commission upon the sale of the SIB CDs, and were eligible to receive as much as a 1% trailing commission throughout the term of the CD.

10.

The commission structure also provided a very strong incentive for SGC financial advisors to be aggressive in their sale of SIB CDs to investors. In 2007, SIB paid SGC and its affiliates more than $291 million in management fees from SIB CD sales. The incentives created by these generous and anomalous commissions mesmerized the SGC Brokers and encouraged them to push the SIB CDs on their clients.

11.

The brokers used sales materials and presentations, and made material misrepresentations, discussed in more detail below, that were false and misleading, emphasizing the safety of the SIB CDs, the liquidity of the bank's underlying portfolio of investments, the fabricated track record of favorable returns, the robustness of the Antiguan government regulation applicable to SIB, the fact that SIB was subject to regular, comprehensive audits, the insurance provided through Lloyds of London, the favorable capital position of SIB and the quality of SIB's investment oversight.

12.

Introducing brokers, which is what Stanford Group Company and the individual broker defendants were, cannot do business without a clearing broker partner. From 2006 on, Pershing LLC was this partner.

13

Defendant Pershing is a clearing broker that served as the intermediary for transactions between SGC and SIB. As the clearing broker, Pershing provided customary clearing broker services, which include the maintenance of books and records, the execution of transactions, paying for the SIB CDs that had been purchased, and delivering the SIB CDs that had been sold.

14.

Pershing was additionally responsible for making assessments of whether to accept an order for processing, whether to execute a transaction on customer accounts and whether the introducing brokerage firm, SGC, was in compliance with its net capital requirements.

4

15.

From 2006 to sometime late in 2008, Pershing was involved in thousands of transactions in which customers of Stanford Group bought SIB CDs. According to the SEC, Pershing sent 1,635 wire transfers to Stanford International Bank totaling $517 million, among other actions in furtherance of the CD program and Stanford Group's purpose.

16.

Pershing silently stopped doing that business in December of 2008. Pershing acted only after continuing to process suspicious SIB CD transactions for many, many months. But Pershing continued to serve as the clearing broker for SGC's customer transactions, even though it knew, or in the exercise of reasonable diligence should have known, that SGC was merely a vehicle for the elaborate Stanford Ponzi scheme, and that the SGC and Pershing customers were at very serious financial risk.

17.

Ultimately, Stanford Group Company was a storefront with its name on fancy office space, but it was Pershing that provided the infrastructure that is necessary for Stanford Group Company and the individual broker defendants to conduct their business, including, of course, the business of selling the SIB CDs that are at issue in this case.

18.

Each of the plaintiffs has incurred substantial damages ranging from the hundreds of thousands to the tens of millions of dollars as a direct result of the conduct of the defendants. Some of the plaintiffs have lost substantial portions of monies they had saved for retirement and were using these monies or intended to use these monies as their primary means of support in retirement.

19.

All of the defendants worked in concert as part of a system designed with the primary purpose of selling CDs issued by the SIB. The broad outlines of their actions are described in the following paragraphs.

## THE WRONGFUL ACTS OF THE SGC BROKERS

20.

By the end of 2008 the massive Stanford CD marketing scheme finally cratered. At that time, SIB had sold nearly $8 billion of the SIB CDs by touting: (1) SIB's safety and security; (2)

consistent, double-digit returns on SIB's investment portfolio; and (3) high interest rates on the SIB CDs that outpaced the rates that commercial banks in the United States were able to offer on certificates of deposit.

21.

Contrary to the representations of SIB and its related entities, such as SGC, by February of 2009, SIB had misappropriated many billions of dollars through bogus personal loans to Stanford and had "invested" a huge sum of investor funds in speculative, unprofitable illiquid private businesses controlled by Stanford.

22.

In order to conceal the Ponzi scheme and continue the influx of investor funds into SIB's coffers, Stanford and Davis falsified the performance of SIB's investment portfolio. Each month, Stanford and Davis pre-determined the rate of return on the investments in SIB's portfolio. Using those predetermined numbers, the SIB accountants reverse-engineered financial statements for SIB to make it appear as though SIB had earned income that it did not actually have. The SGC Brokers knew, or at least had access to information that clearly demonstrated, that the figures that Stanford reported as its returns did not match the actual returns.

23.

The SGC Brokers were registered representatives of Stanford Group Company and were investment advisors to the Plaintiffs. In their fiduciary roles as investment advisers, the SGC Brokers recommended the purchase and/or renewal of what they called "certificates of deposit" issued by the SIB. SGC Brokers received lucrative commissions on the sale of the SIB CDs that far exceeded the market rate. The SGC brokers had an extraordinary financial incentive for marketing and selling the SIB CDs to the plaintiffs. By acting in accordance with their individual financial incentive and against the interest of the Plaintiffs, they breached their fiduciary and other duties, including the duties of loyalty and of candor and their duties under Articles 2315 *et seq.* of the Louisiana Civil Code.

24.

In selling the SIB CDs to investors, the SGC brokers repeatedly touted the CDs' safety and security and SIB's consistent, double-digit returns on its investment portfolio.

6

25.

In its brochures, SIB told investors, under the heading "Depositor Security," that its investment philosophy is "anchored in time-proven conservative criteria, promoting stability in [SIB's] certificate of deposit." SIB also emphasized that its "prudent approach and methodology translate into deposit security for our customers." Further, SIB stressed the importance of investing in "marketable" securities, saying that "maintaining the highest degree of liquidity" was a "protective factor for our depositors."

26.

In its 2006 and 2007 Annual Reports, SIB told investors that the banks' assets were invested in a "well-balanced global portfolio of marketable financial instruments, namely U.S. and international securities and fiduciary placements." More specifically, SIB represented that its 2007 portfolio allocation was 58.6% equity, 18.6% fixed income, 7.2% precious metals and 15.6% alternative investments.

27.

In lockstep with the annual reports and brochures, SGC brokers were trained to represent that the "liquidity/marketability of SIB's invested assets" was the "most important factor to provide security to SIB clients." In training materials, it was also claimed that SIB had consistently earned high returns its investment of deposits (ranging from 11.5% in 2005 to 16.5% in 1993). The SGC brokers in turn parroted these claims to convince their clients to purchase the SIB CDs.

28.

Although SGC Brokers referred to the instruments as "certificates of deposit" that were being issued by a "bank," the instruments that the SGC Brokers were selling were really high risk speculative bonds being issued by a leveraged hedge fund. As a result, none of the stability and security that investors associate with the terms "bank" and "certificate of deposit" accompanied these instruments. The use of the term "certificates of deposit" in relation to these investments was itself highly misleading. The individual brokers knew that the use of this description was creating a false sense of stability, liquidity and security. In fact, the SIB CDs were the prime component in an elaborate Ponzi scheme, whereby cash flow realized from the proceeds of the sale of SIB CDs to new investors was used to pay interest and to return invested principal to the holders of older SIB CDs.

7

260706v.2

29.

The SGC Brokers, seasoned financial advisors who had been recruited from other well-known investment firms, should have known that the representations being made by SIB about the CDs were not true, especially in light of the ample red flags that cropped up. But lured by the lucrative commissions they could reap, the SGC brokers failed to take the requisite steps that would have uncovered the truth. Because of the acts and omissions of the Broker-Defendants surrounding the sale of the SIB CDs to the Plaintiffs, the Plaintiffs were misinformed about the risks inherent in CDs that were marketed as safe, liquid investments, but which were in fact hollow bricks in the Stanford pyramid scheme. The SGC Brokers failed to inquire into the material risks involved in the SIB CDs, having become mesmerized by the substantial personal profits they gained from the sale of those CDs to the plaintiffs – sales which, all told, amounted to millions of dollars.

30.

The high commissions for the sale of the SIB CDs and the above-market returns promised by the SIB and various other red flags, such as unusual regulatory attention directed at various Stanford entities, lawsuits and claims against Stanford, internal discussion of "runs on the bank" in 2008 and other obvious issues, placed the individual broker defendants squarely on notice that the SIB CDs were extremely risky, highly speculative, potentially illiquid and quite possibly a part of a Ponzi scheme, where new investors paid for redemptions by existing investors. The individual defendants were on personal notice of a potential for a calamitous collapse of these investments based on the facts they knew. While perhaps not all of them knew for certain that there was the potential for such a catastrophic problem roiling beneath the surface, at the very least they should have, in the exercise of reasonable diligence, known of the problem.

31.

The SGC Brokers failed to request the most basic financial disclosures from SIB including SIB's financial statements, its valuation reports, or its methodology for reporting income. Nor did the SGC Brokers request that SIB disclose the performance of its investments. The SGC Brokers never disclosed to the Plaintiffs that they were recommending the purchase of SIB CDs without any of the pertinent data needed to support such a recommendation.

8

32.

The SGC Brokers affirmatively represented to the Plaintiffs that SIB's financial statements were audited and prepared in accordance with generally accepted accounting principals ("GAAP"), that SIB's assets had been independently valued by outside auditors, and that professional analysts were monitoring SIB's portfolio of assets. In fact, SIB's assets had not been meaningfully audited or verified. The SGC Brokers were in a position to know this and were reckless in failing to discover this.

33.

Contrary to the SGC Brokers' representations, SIB's accountant, a small local firm in Antigua, took on the responsibility for auditing the SIB's multi-billion dollar investment portfolio. Detailed financial statements were never requested by SGC Brokers. The financial statements were not prepared in accordance with GAAP. And the SIB's asset portfolio was monitored primarily by R. Allen Stanford and James Davis — two of the principals in the Stanford Ponzi scheme. The SGC brokers simply acquiesced to SIB's efforts to prevent any true accounting of its financial position, abdicating their professional responsibility and duty to their clients.

34.

The SGC Brokers further represented that SIB was a bank that was subject to regulation and audit by the Antiguan government. But SIB was not really a bank, at least not in the way that Stanford's clients thought it was. Instead, SIB largely functioned as the private account of R. Allen Stanford.

35.

The individual brokers owed fiduciary and other duties to their clients under Louisiana and other applicable laws. They were trusted advisors who owed continuing duties of loyalty, complete candor and full disclosure to their clients. Unfortunately, the lure of high, above-market commissions for the sale of the SIB CDs blinded the brokers to the many obvious problems with the CDs. The individual brokers owed the duty to keep their clients up-to-date on material information regarding the certificates and failed to do so.

36.

The SGC Brokers represented that in marketing and selling the SIB CDs to the Plaintiffs, they had the Plaintiffs' best interests in mind. But the brokers failed to disclose to the Plaintiffs

265706v 2

that they were receiving commissions on the sale of the SIB CDs that were many times more than would result from the sale of a traditional certificate of deposit, and they further failed to disclose that the sale of SIB CDs was the lifeblood for the continued viability of SGC. The conflict of interest inherent in these transactions was never revealed to the Plaintiffs. This was a breach of their duty of loyalty.

37.

The SGC Brokers represented that the investments in SIB CDs were arms-length transactions. In fact, the SGC Brokers were highly dependent on the sale of SIB CDs to maintain profitability.

38.

The SGC Brokers represented that SIB's investments were in safe, liquid financial instruments. However, beginning in late 2007 and continuing into 2008, SIB began experiencing liquidity problems and was unable to redeem all of the SIB CDs. As a result, the brokers redoubled their efforts to sell SIB CDs and crafted a special marketing plan to promote sales of the SIB CDs. The brokers failed to inquire into the liquidity of the SIB CDs and failed to inform the Plaintiffs of the liquidity problems of SIB.

39.

The SGC Brokers represented to the Plaintiffs that SIB was a profitable entity that was realizing profits in the form of dividends from the companies in which SIB had invested. In reality, the cash flow into SIB consisted almost entirely of profits from the sale of SIB CDs to new investors, and the net profits were conjured out of thin air through revaluation of assets and asset swaps that never actually occurred.

40.

The SGC Brokers represented to the Plaintiffs that they had knowledge of the companies in which SIB had invested and that each of these companies possessed adequate capital to repay any funds advanced by SIB. But the brokers had no actual knowledge of where SIB had invested the income earned from the sale of the SIB CDs and made no independent attempts to acquire information on the management, financial operations, capital structure or leverage of the companies in which SIB had purportedly invested.

265706v 2.

41.

The individual defendants used the good name and reputation of Lloyd's of London to lull their clients into the belief that the sales of the certificates of deposit were backed by a safety net of Lloyd's insurance products including excess deposit insurance, professional liability insurance, and errors and omissions insurance that could be accessed to protect the investors if something went wrong.

## THE WRONGFUL ACTS OF PERSHING

42.

The individual Broker-defendants registered with the Stanford Group Companies were instrumental in the sales of these CDs to the Plaintiffs. Stanford Group Companies, in turn, could not have done business, including its primary business of selling the SIB CDs without the continuing assistance of Pershing.

43.

Pershing markets its clearing broker business as providing "infrastructure" and "innovative solutions" that "help you attract new investors, capture additional assets, increase profits and increase processing efficiencies. The tools we offer help you comply with increasingly complex and changing regulatory requirements."

44

Pershing fulfills a number of important functions for its customers and the customers of Stanford Group Companies. Pershing is the custodian for securities held by customers, Pershing executes and clears trades in the customers' accounts, Pershing monitors capital requirements and fulfills certain regulatory and back office functions, Pershing accounts for transactions and regulatory values for the securities it holds, Pershing provides research, Pershing issues confirmations and account statements, Pershing accounts for individual broker commission credits and payments, Pershing monitors accounts for compliance with margin requirements, and Pershing transfers funds to facilitate various customer transactions.

45.

Stanford "outsourced" many functions to Pershing and Stanford and Pershing had a *de facto* partnership or joint venture relationship. As Pershing itself volunteered, "You can turn to us for a comprehensive range of outsourcing solutions to every need, combined with a uniquely

11

consultive custom-tailored approach. At Pershing you will find a partner committed to supporting your business without limits."

46.

Pershing became aware at least by 2007 that the SIB CDs were not what they were represented to be, that the assets securing them were not what they were represented to be and that the value of SIB assets was not what it was represented to be. Pershing had knowledge that the SIB CDs were not remotely like certificates of deposit issued by American banks and, instead, that the whole Stanford operation focused on selling these certificates was a giant, irresponsible marketing scheme, virtually certain to end in the collapse of the CDs.

47.

Pershing ultimately became so concerned about the viability of this program and the SIB CDs themselves that Pershing made the decision, many months after Pershing knew of the problems, to refuse to participate any further in the transfer of money from the Stanford Group customer accounts held at Pershing to the SIB. Pershing notified Stanford Group of this decision, but made no effort to notify the customers or to stop supporting Stanford's operation in other ways.

48.

Even after Pershing stopped transferring customer monies to SIB, Pershing continued to supply the SGC with the necessary infrastructure to assist SGC in perpetuating its fraudulent business, including the certificate sales. This decision had the effect of continuing the income stream that Pershing established through "partnering" with Stanford to perform the essential functions necessary to support Stanford's "storefront" operation, but it also ensured the ultimate demise of billions of dollars of their innocent customers' money.

49.

Pershing owed direct duties to its clients and to the world at large to cease aiding SGC and the SGC brokers in conducting this business. Pershing's actions made the certificates sales possible and cloaked the whole operation with respectability and authority. Without Pershing's assistance, SGC could not have sold the quantity of SIB CDs that it sold.

50.

Once Pershing knew that SGC customers were being duped into buying the SIB CDs based upon misrepresentations as to the nature of the investment, Pershing could not, either

12

under the law nor in using good business practices, continue to make profits by clearing transactions for Stanford Group, knowing that by doing so, Pershing was directly furthering the fraud and placing Pershing customers at additional substantial risk.

51.

There is considerable evidence of all of this in Pershing's files and in Pershing's computer system. That evidence needs to be safeguarded at the inception of this case.

## INSURANCE COVERAGE

52.

At all relevant times, defendant Lloyd's provided errors and omissions liability coverage for the SGC Brokers. Each broker was an insured under the respective policy of insurance. Further, each of the policies provides coverage for damages to Plaintiffs caused by the acts and omissions of the SGC Brokers.

53.

At all relevant times, ABC Insurance Company provided comprehensive general liability coverage for the SGC Brokers. Each broker was an insured under the respective policy or policies of insurance. Further, each of they comprehensive general liability policies provides coverage for damages to Plaintiffs caused by the acts and omissions of the SGC Brokers.

54.

At all relevant times, XYZ Insurance Company provided insurance coverage for Pershing. Pershing and its employees were insured under the respective policy or policies of insurance. Further, each of the policies provides coverage for damages caused to Plaintiffs caused by the acts and omissions of Pershing.

## CAUSES OF ACTION

## NEGLIGENCE

55.

Paragraphs 1 - 54 are incorporated herein by reference.

56.

SGC Brokers and Pershing are liable under Louisiana Civil Code Articles 2315 *et seq.*

13

57.

SGC Brokers owed Plaintiffs a duty of care as professional broker-dealers and investment advisors. This duty includes the obligation to perform due diligence on Plaintiffs' behalf prior to making an investment in the SIB CDs and to not make unconfirmed representations.

58.

The SGC Brokers breached this duty of care and were negligent in failing to perform their requisite duties as advisors and brokers for the Plaintiffs.

59.

Pershing owed the Plaintiffs a duty of care as custodian of their invested funds. This duty included the obligation to inform the Plaintiffs when Pershing personnel began to suspect that the SIB CDs were not a valid financial instrument.

60.

Pershing breached its duty to the Plaintiffs when it failed to inform the Plaintiffs of its suspicions regarding the SIB CDs and Pershing further breached its duty by failing to inform the Plaintiffs that it was withdrawing as the clearing broker for SIB CDs.

61.

Plaintiffs have suffered damages as a result of the Defendants' breaches of duty.

## BREACH OF CONTRACT

62.

Paragraphs 1 - 54 are incorporated herein by reference.

63.

An agreement existed between SGC Brokers and the Plaintiffs. As a part of that agreement, the SGC Brokers were obligated to advise the Plaintiffs concerning the risk of their investments by spending the time necessary to evaluate those investments.

64.

The SGC Brokers breached the agreement by failing to spend adequate time evaluating with due diligence the investments that they sold to the Plaintiffs. Further, the SGC Brokers failed to obtain information that would have been material to the Plaintiffs' decision to invest in the SIB CDs and failed to inform the Plaintiffs of the highly-lucrative compensation arrangements between SGC and SIB. These omissions constitute a breach of contract, including a breach of the duties of good faith and fair dealing that are implied in every contract.

14

65.

Plaintiffs have suffered damages as a result of the SGC Brokers' breaches of contract.

## NEGLIGENT MISREPRESENTATION

66.

Paragraphs 1 - 54 are incorporated herein by reference.

67.

Pleading in the alternative, Plaintiffs' allege that the SGC Brokers made negligent misrepresentations to the Plaintiffs.

68.

In the course of their dealing with the Plaintiffs, SGC Brokers made multiple representations to the Plaintiffs in which they supplied false information.

69.

The SGC Brokers supplied false information that Plaintiffs reasonably relied on to make their investment decisions.

70.

The SGC Brokers failed to exercise reasonable care in verifying the accuracy of the information that they communicated to the Plaintiffs.

71.

Plaintiffs have suffered damages because of the SGC Brokers' failure to exercise reasonable care.

## BREACH OF FIDUCIARY DUTY

72.

Paragraphs 1 - 54 are incorporated herein by reference.

73.

Pleading in the alternative, Plaintiffs allege that the SGC Brokers and Pershing have breached the fiduciary duties they owed to the Plaintiffs.

74.

Plaintiffs reposed trust and confidence in the SGC Brokers and in Pershing, which relationship of trust gave rise to a fiduciary duty. The SGC Brokers and Pershing therefore owed a duty to the Plaintiffs to act fairly and in the utmost good faith in all of their transactions with the Plaintiffs, to make a full and fair disclosure of all material facts to the Plaintiffs, to refrain

15

from taking advantage of their relationship with the Plaintiffs for personal gain, and to act openly and honestly regarding their transactions with the Plaintiffs.

75.

The SGC Brokers breached this fiduciary duty by failing to determine the accuracy of the investment advice they were communicating to the Plaintiffs. The brokers further breached this duty by failing to disclose their conflicts of interest to the Plaintiffs that resulted in the brokers' great personal gain from the sale of the SIB CDs.

76.

Pershing breached its fiduciary duty to the Plaintiffs by failing to inform the Plaintiffs of its suspicions surrounding the legitimacy of the SIB CDs. Pershing further breached its duty to the Plaintiffs by failing to inform the Plaintiffs that it had ceased serving as the clearing broker for SIB CD transactions with SGC, but continued to serve as the broker for all other SGC transactions.

77.

Plaintiffs suffered damages as a result of the Defendants' breaches of fiduciary duty.

## VIOLATIONS OF THE LOUISIANA SECURITIES ACT

78.

Paragraphs 1 - 54 are incorporated herein by reference.

79.

Based upon the above allegations, the SGC Brokers and Pershing have violated the Louisiana Securities Act (La. R.S. section 51.701 *et. seq.*).

80.

The SGC Brokers sold securities to the Plaintiffs within the meaning of the words "sale" and "security," as those terms are defined in Section 702 of the Louisiana Securities Act. The brokers sold those securities by means of untrue statements of material fact and/or omissions of material facts, which made their statements misleading in the light of the circumstances in which they were made.

81

These misrepresentations and omissions were in violation of Section 712 of the Louisiana Securities Act.

365706v 2

82.

In addition, the SGC Brokers sold securities that were not registered in accordance with the laws of the State of Louisiana and were not subject to a private placement exemption under the laws of the State of Louisiana.

83.

The failure to register violated Sections 705 and 712 of the Louisiana Securities Act.

84.

Plaintiffs relied on the foregoing misrepresentations and/or omissions to their detriment.

85.

The SGC Brokers, directly and indirectly, prepared, disseminated or used contracts, written offering documents, promotional materials, investor and other correspondence, and oral presentations, which contained untrue statements of material facts and misrepresentations of material facts, and which omitted to state material facts that were necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading.

86.

Plaintiff suffered damages as a result of SGC Brokers' violations of the Louisiana Securities Act.

87.

Pershing aided and abetted the SGC Brokers in their violations of the Louisiana Securities Act.

88.

Further, Pershing committed its own, independent violations of the Louisiana Securities Act. Pershing materially participated in the sale of the securities to the Plaintiffs as a "dealer," as that term is defined in Section 702 of the Louisiana Securities Act.  Pershing materially participated in the sale of securities to the Plaintiffs by providing services that included the maintenance of books and records, the execution of transactions, paying for the SIB CDs that had been purchased and delivering the SIB CDs that had been sold. Pershing was additionally responsible for making assessments whether to accept an order for processing, whether to execute a transaction on customer accounts and whether the introducing brokerage firm, SGC, was in compliance with its net capital requirements.

17

89.

Pershing knew, or in the exercise of reasonable care should have known, of the existence of the facts under which the SGC Brokers are liable.

90.

Pershing's acts and/or omission violated Section 714 of the Louisiana Securities Act. Pershing is liable jointly and severally and to the same extent as the SGC Brokers for the sales of SIB CDs in violation of Section 712 of the Louisiana Securities Act.

91.

Plaintiffs suffered damages because of Pershing's violations of Section 714 of the Louisiana Securities Act.

## VIOLATIONS OF LOUISIANA RACKETEERING ACT

92.

Paragraphs 1 - 54 are incorporated herein by reference.

93.

Based upon the above allegations, Defendants violated the Louisiana Racketeering Act (La. R.S. Sec. 15:1351 *et seq.*).

94.

The SGC Brokers knowingly participated in the investment enterprise operated by the Stanford entities through a pattern of racketeering activities that involved violations of the Louisiana Securities Act.

95.

Pershing knowingly received proceeds from the pattern of racketeering activity engaged in by the Stanford entities and the individual brokers, and Pershing used those proceeds in the operation of its own enterprise.

96.

Plaintiffs suffered damages as a result of the Defendants' violations of the Louisiana Racketeering Act, entitling the Plaintiffs to three times their actual damages sustained and attorney fees and costs.

## CONSPIRACY

97.

Paragraphs 1 - 54 are incorporated herein by reference.

18

98.

Defendants are liable under Louisiana Civil Code Article 2324.

99.

The Defendants had an agreement with regard to the sale and clearing of SIB CDs. Pershing assisted in the tortious acts committed by the SGC Brokers by serving as the clearing broker and financial intermediary even though it knew that there were grave infirmities with the viability of the Stanford financial instruments. Pershing further knew that those infirmities would result in substantial injury to the plaintiffs.

100.

The continuing relationship and agreement between the SGC Brokers and Pershing resulted in Plaintiffs' injury. Defendants are therefore liable to the Plaintiffs, *in solido*, for damages caused by their tortious.

## INSURANCE COVERAGE

101.

Paragraphs 1 - 54 are incorporated herein by reference.

102.

At all relevant times, Certain Underwriters at Lloyd's of London provided directors and officers and professional liability coverage for the SGC Brokers. Each was an insured under the insurance policies issued by Lloyd's. Each of the policies provides coverage for damages to Plaintiffs caused by the actions and inactions of the SGC Brokers.

103.

At all relevant times, ABC Insurance Company provided comprehensive general liability coverage for SGC Brokers. Each broker was an insured under the respective policy or policies of insurance. Further, each of the comprehensive general liability policies provides coverage for damages to Plaintiffs caused by the actions and inactions of the SGC Brokers.

104.

Based upon information and belief, the policies issued by Lloyd's and ABC Insurance Company provide coverage for damages caused by the actions and inactions of SGC Brokers as set forth in Paragraphs 1 - 54 of this Petition.

105.

The acts and omissions of the SGC Brokers constitute multiple occurrences under the policies of insurance issued by Lloyd's and ABC Insurance Company.

106.

The policies of insurance issued by Lloyd's and ABC Insurance Company do not exclude damages caused by the actions and inactions of the SGC Brokers.

107.

The acts and omissions of the SGC Brokers have caused damages during the policy terms of the policies of insurance issued by Lloyd's and ABC Insurance Company.

108.

As a result, Lloyd's and ABC Insurance Company are liable *in solido* with SGC Brokers for all damages, direct or indirect, consequential, attorneys' fees, loss of income, interest, or diminution in value caused by any of the SGC Brokers.

109.

At all relevant times, XYZ Insurance Company provided liability coverage for Pershing. Pershing and its employees were insureds under the insurance policies issued by XYZ Insurance Company. Each of the policies provides coverage for damages to Plaintiffs caused by the actions and inactions of Pershing.

110.

Based upon information and belief, the policies of XYZ Insurance Company provide coverage for damages caused by the actions and inactions of Pershing as set forth in Paragraphs 1 - 54 of this Petition.

111.

The acts and omissions of Pershing constitute multiple occurrences under the policies of insurance issued XYZ Insurance Company.

112.

The policies of insurance issued by XYZ Insurance Company do not exclude damages caused by the actions and inactions of Pershing.

265706v.2

113.

The acts and omissions of Pershing have caused damages during the policy terms of the policies of insurance issued XYZ Insurance Company.

114.

As a result, XYZ Insurance Company is liable *in solido* with Pershing for all damages, direct or indirect, consequential, attorneys' fees, loss of income, interest, or diminution in value caused by Pershing.

## JURY DEMAND

Plaintiffs demand trial by jury of all issues.

WHEREFORE, Plaintiffs pray for the following:

A. That Defendants be cited to appear and answer;

B. That the Court enter an order directing Defendant Pershing to safeguard and preserve all evidence in Pershing's files and computer systems relating to this matter.

C. That, upon trial on the merits, judgment be entered holding SGC Brokers, Lloyd's and ABC Insurance Company liable, *in solido*, for all claims ;

D. That, upon trial on the merits, judgment be entered holding Pershing liable jointly and severally and to the same extent as SGC Brokers for violations of the Louisiana Securities Act;

E. That, upon trial on the merits, Plaintiffs recover actual damages;

F. That, upon trial on the merits, Plaintiffs recover attorneys fees, prejudgment interest, post-judgment interest, costs of court, and such other and further relief to which Plaintiff may be justly entitled; and

G. For all other equitable and legal relief as provided by law.

Respectfully submitted.

JAMES R. SWANSON, #18455
BENJAMIN D. REICHARD, #31933
FISHMAN HAYGOOD PHELPS
   WALMSLEY WILLIS & SWANSON, L.L.P.
201 St. Charles Avenue, 46th Floor
New Orleans, LA 70170-4600
Telephone: (504) 586-5252
Attorneys for Plaintiffs

*[SERVICE INSTRUCTIONS BELOW]*

21

**PLEASE SERVE:**

**JASON GREEN**
19231 S. Lakeway Avenue
Baton Rouge, Louisiana 70810

**CHARLES JANTZI**
723 Troutbeck Drive
Baton Rouge, Louisiana 70810

**TIFFANY ANGELLE**
403 Boulder Creek Parkway,
Lafayette, Louisiana 70508

**RONALD CLAYTON**
1962 Stuart Avenue
Baton Rouge, Louisiana 70808

**JOHN SCHWAB**
2446 June Street
Baton Rouge, Louisiana 70808

**HOPE BELLELO.**
8434 Tina Lane
Maringouin, Louisiana 70757

**PLEASE SERVE VIA LOUISIANA LONG ARM STATUTE:**

**LLOYD'S OF LONDON**
via its agent for service of process:
**MENDES & MOUNT**
750 Seventh Avenue
New York, New York 10019-6829

**PERSHING, L.L.C.**
via its registered agent for service of process:
**BNY MELLON TRUST OF DELAWARE**
White Clay Center, Route 273
Newark, Delaware 19711

## CIVIL

- [x] 01-DAMAGES
- [ ] 02-CONTRACT
- [ ] 03-POSSESSOR SUIT
- [ ] 04-DECLARATORY PROCESS
- [ ] 05-...
- [ ] 06-...
- [ ] 07-WRIT...
- [ ] 08-JUDICIAL REVIEW
- [ ] 09-PROPERTY RIGHTS
- [ ] 10-INJUNCTION MANDAMUS

- [ ] 11-COMM. PROP. PARTITIONS
- [ ] 12-PUBLIC SERV. COMM.
- [ ] 13-OTHER PARTITIONS
- [ ] 14-OTHER
- [ ] ...
- [ ] ...
- [ ] ...
- [ ] 18-...
- [ ] 19-...
- [ ] 20-...

265706v.2

# Exhibit B

IN THE CIRCUIT COURT OF THE 15th
JUDICIAL CIRCUIT, IN AND FOR
PALM BEACH COUNTY, FLORIDA

CASE 50 2009 CA 02 4830 XXXXMB

LYNNE TURK, individually, as Trustee
of the Lynne Caponera Revocable Trust,
and on behalf of all others similarly situated,

Jury Trial Demanded           

     Plaintiffs,

vs.

PERSHING LLC, a Delaware limited
liability company,

     Defendant.

_____/

COPY
RECEIVED FOR FILING

JUL 2 3 2009

SHARON R. BOCK
CLERK & COMPTROLLER
CIRCUIT CIVIL DIVISION

**COMPLAINT**
**(Class Representation)**

    Plaintiff LYNNE TURK, individually, as trustee, and on behalf of all others similarly

situated, sues the Defendant PERSHING LLC ("Pershing"), and alleges as follows:

**Jurisdiction and Venue**

    1.    This is a class action brought pursuant to the Florida Securities and Investor

Protection Act (the "Florida Act"), sections 517.07, 517.211, Florida Statutes, and Florida Rule

of Civil Procedure 1.220, seeking damages that exceed $15,000, exclusive of interest, attorneys'

fees, and costs. This class action does not involve a "covered class action," under the federal

Securities Litigation Uniform Standards Act of 1998, and is not otherwise subject to the Act.

    2.    Jurisdiction is proper in this Court. The Defendant is licensed as a broker/dealer

in the state of Florida, and has therefore consented to jurisdiction in this State. The actions

complained of herein are violations of Florida's securities statutes and took place in part in Palm

Beach County, Florida. Personal jurisdiction also exists under Florida's long arm statute.

3.      Venue is also proper in this Court.   The Defendant transacts business in Palm Beach County, Florida.  The actions giving rise to this litigation occurred in Florida, as the Plaintiffs acquired the securities at issue, and the damages to the Plaintiffs occurred, in Palm Beach County, Florida.

<u>Parties</u>

4.      Plaintiff LYNNE TURK ("Turk") is a citizen and resident of Palm Beach County, Florida, and is *sui juris*.  Turk is the trustee of the Lynne Caponera Revocable Trust.  She is the sole beneficiary of the Trust and therefore the beneficial owner of the assets of the Trust.

5.      Defendant PERSHING LLC ("Pershing") is a Delaware limited liability company, with its principal place of business in New York.  Pershing is a registered broker-dealer, and it is authorized to conduct business, and does conduct business, in Florida. According to its website, Pershing has over 70 years of experience in the financial industry, and is the largest provider of global clearing services to other firms and institutions, which include the services described in more detail below.

<u>Class Representation Allegations</u>

6.      Plaintiff brings this action as a class action pursuant to Rule 1.220(a) and (b)(3) of the Florida Rules of Civil Procedure.  The definition of the Plaintiff class in this action is:  all persons or entities resident in the State of Florida or otherwise subject to Florida law who purchased Stanford International Bank Ltd. "certificates of deposit" (the "CDs") during the applicable statute of limitations period.

7.      The class meets the requirements for class certification under Rule 1.220(a) of the Florida Rules of Civil Procedure.

2

a. Numerosity. The class consists of at least several hundred members who are residents of Florida or are otherwise subject to Florida law. The exact number of class members is currently unknown to the Plaintiff, and can only be ascertained through appropriate discovery; however, purchasers of the CDs may be identified from the records maintained by Pershing. This number is so numerous that joinder of all members of the class is impracticable.

b. Commonality. There are questions of law and fact which are common to the representative party and each member of the class including: (i) whether Stanford International Bank, Ltd. and its affiliated entities and agents engaged in an unregistered public offering of unregistered securities in violation of the Florida Act; (ii) whether Pershing was an agent of Stanford International Bank, Ltd and/or its affiliates in making, participating or aiding in the sales of unregistered securities; and (iii) whether Plaintiff and the class members are entitled to the remedy of rescission or damages.

c. Typicality. Plaintiff's claim is typical of each of those of the class members. Plaintiff suffered the same type of injury as did other members of the class in that they purchased unregistered CDs in an unregistered public offering and have the right to rescind such purchase or seek damages as a result thereof.

d. Adequacy: Plaintiff will fairly and adequately represent and protect the interest of the class and has no interest antagonistic to those of the other class members. Plaintiff has retained experienced counsel competent in securities litigation and class litigation.

8. This class also meets the requirements of Rule 1.220(b)(3) of the Florida Rules of

3

Civil Procedure. The common issues outlined herein predominate over any individual issues in this case. A class action is superior to all other available means for the fair and efficient adjudication of this controversy because: (1) it is economically impracticable for class members to prosecute individual actions against Pershing; (2) Plaintiffs are aware of no other litigation concerning the claims against Pershing; (3) it is desirable to concentrate these claims against Pershing in a single forum so as to avoid varying and disparate results; and (4) there is no difficulty likely to be encountered in the management of this case as a class action.

### The Stanford Ponzi Scheme and the Offer and Sale of Unregistered Securities

9.     Plaintiff purchased so-called "certificates of deposit" ("CDs") purportedly issued by Stanford International Bank, Ltd. ("SIB"). SIB purports to be a foreign private bank located in Antigua, West Indies. Antigua is well known in the financial industry to have little to no regulation or oversight over the banks operating there, and it is notorious as a money laundering haven.

10.     The CDs were sold by and through SIB's affiliated U.S. broker dealer/investment advisors, Stanford Group Company ("SGC"). SGC is a broker/dealer and investment advisor registered with the Securities and Exchange Commission ("SEC") and the State of Florida. SIB's and SGC's primary product was the CD.

11.     Stanford Capital Management ("SCM") is also a broker/dealer and investment advisor registered with the SEC.

12.     By the end of the year 2008, SIB and SGC had sold approximately $8 billion in CDs through their affiliated broker/dealers and brokers employed by them. Upon information and belief, at least hundreds of millions of dollars worth of such CDs were sold in Florida or to Florida residents, including Turk.

13.    SIB, SGC, and SCM were at all relevant times affiliated with and controlled by R. Allen Stanford ("Stanford").   Stanford, through these affiliated entities, engaged in a massive Ponzi scheme.   In carrying out this scheme, Stanford misappropriated billions of dollars in investors' funds invested in the CDs.

14.    In an effort to conceal the fraudulent conduct and maintain the flow of investor money to SIB, Stanford fabricated the performance of SIB's investment portfolio showing purported investment returns which were consistently in excess of those reported with respect to any comparable CD investment. These reported CD returns were unlikely or impossible, and bore no relationship to the performance of the SIB's actual investment results. SIB also falsified its financial statements in an effort to conceal the fraudulent conduct.

15.    The SEC has commenced an action against Stanford, his affiliates, and others concerning this Ponzi scheme.

16.    This Ponzi scheme involved the sale, through an illegal, unregistered public offering, of CDs issued by SIB and SGC to investors in the United States and specifically in Florida.

17.    The CDs are securities as defined under Section 2(1) of the federal Securities Act of 1933 (the "Securities Act") and under Section 517.021(21)(g) of the Florida Act. The CDs were not insured, nor were they subject to regulatory schemes similar to that in the United States or Florida. They were instead sold in an unregulated environment from Antigua, West Indies.

18.    The offering of CDs, conducted on a continuous basis from at least 2005 through 2008, was described in offering materials as a private placement, and SIB purportedly offered the CDs pursuant to an exemption from registration under the federal Securities Act and Florida Act.

19.    However, the offering of CDs was in fact an unregistered public offering made in

violation of Chapter 517 of the Florida Act. It was an integrated offering under federal and Florida securities laws, and involved each of the following factors indicating that it was a public offering and not a private offering exempt from registration:

    a.    The integrated offering involved general solicitation. This general solicitation by SIB and its U.S. affiliates and agent brokers included general public advertisements, publicly distributed magazine articles and other communications and media published in print and distributed broadly for general distribution in the United States (including in Florida) to offerees and purchasers of the CDs. SIB has acknowledged that it employed marketing literature other than its private placement memorandum on a regular basis.

    b.    The integrated offering involved general solicitation through television advertisements, including advertisements broadcast in Florida, of the Stanford financial products, including CDs.

    c.    The integrated offering involved seminars and meetings conducted in the United States (including Florida) and Antigua, West Indies. The integrated offering was conducted through the use of sales seminars, "road shows", and meetings directed at potential offerees and purchasers. These meetings took place in the United States (including Florida) and in Antigua.

    d.    The integrated offering involved offers to thousands of offerees and purchases by thousands of offerees. The integrated offering involved offers to, and purchases by, at least hundreds of Florida residents or those otherwise subject to Florida law.

    e.    The aggregate size of the sales of CDs in the U.S. during this period was

in excess of $3 billion. The aggregate size of the sales in Florida from this period was at least several hundred millions of dollars.

    f.      Many of the offerees of the offering in Florida and elsewhere were not accredited investors; therefore the offering did not comply with the limitations on offers and sales to accredited investors under Regulation D and Chapter 517 of the Florida Act.

    g.      The offering was made to investors with whom SIB had no pre-existing relationship, through brokers of an affiliate of SIB who were paid substantial and excessive undisclosed commissions in connection with the CDs.

### Pershing Participated and Aided in the Sale of Unregistered Securities

    20.      As set forth above, by the end of 2008, SIB and SGC had sold approximately $8 billion in CDs by publicly advertising their safety and security, consistent double digit returns, and by fabricating reasons why these CDs yielded a return that greatly exceeded that of commercial bank CDs offered in the United States.

    21.      At least hundreds of millions of dollars in CD purchases were made by class members through Pershing as SGC's clearing firm.

    22.      Throughout the relevant time period, SGC "cleared" all of its business, including its Florida business, through Pershing pursuant to a fully disclosed clearing agreement. In its capacity as a clearing agent, Pershing held all of the cash assets of SGC customers and all the securities of SGC customers.

    23.      In order to effect the unregistered public offering of securities, SIB and SGC employed Pershing as their agent. Pershing, as the agent of SIB and SGC, actively and personally participated and aided in the sale of the unregistered CDs, and engaged in conduct

that induced purchasers to invest in CDs. Pershing's participation included, but is not limited to, the conduct described below.

24.    Pershing transferred billions of dollars from the securities accounts it maintained for U.S. customers of Stanford to SIB in order to effect the sale of CDs. Pershing transferred money from SGC customers and their accounts to SIB in Antigua, even though each of these thousands of wire transfers from a domestic account to an Antiguan bank for the purchase of a CD was highly unusual in and of itself.

25.    Pershing transferred funds from SGC customers' accounts for the purchase of CDs, and Pershing issued confirmations and statements to customers reflecting the transfer of such funds.

26.    Pershing also extended credit to customers to enable them to purchase CDs. Pershing provided loans and margin financing for Stanford customers to purchase CDs, and Pershing received interest on such loans.

27.    Pershing's participation and aid was motivated in part by a desire to serve its own financial interests, as well as the financial interests of SIB and its affiliated entities. Pershing profited from each CD sale because it received compensation from SGC for processing each CD purchase.

28.    Moreover, at all relevant times Pershing, a sophisticated and experienced broker-dealer, knew or should have known that the offering of SIB CDs through SGC was an illegal, unregistered public offering.   Yet Pershing willingly lent its good name and reputation to enhance SIB's and SGC's appearance of legitimacy for the sake of protecting its exorbitant profits from sales of the unregistered CDs.

29.    Pershing, as clearing broker, had the responsibility to provide customers with the

8

prospectus filed with the SEC but it did not do so.   It knew or had reason to believe that the offering and the securities were improperly unregistered.

30.    Pershing was at all times aware that SIB was paying SGC and its brokers excessive compensation for the sale of the CDs, because Pershing maintained the brokerage accounts for these brokers and saw the commissions paid into such accounts.   SGC's brokers were paid an upfront and "trailing" fee in connection with the CDs which was well in excess of industry standards for commissions with respect to CDs.   These excessive commissions indicated, or should have indicated, to Pershing that SIB and SGC were engaged in an aggressive sales effort with respect to the CDs inconsistent with the limitations on such sales efforts for legitimate private placements pursuant to Florida law.

31.    As a registered broker-dealer and clearing firm, Pershing had an affirmative obligation under federal law to monitor SGC, and to identify and report any suspicious activity to the U.S. Treasury Department's Crimes Enforcement Network.   Pershing was required to file a "suspicious activity report" ("SAR") of any "possible violation of law or regulation," including any transaction Pershing "knows, suspects" or has reason to believe involves funds derived from an illegal activity. *See* 31 C.F.R. § 103.19(a)(2).

32.    Upon information and belief, Pershing expressed internal concerns with respect to the CD offering and the financial status of SIB and the authenticity and validity of the returns purportedly being paid on the CDs.

33.    Nonetheless, Pershing failed to timely file an SAR or otherwise inform regulatory authorities of what it knew or should have known to be an illegal unregistered sale of securities. Pershing's failure to act directly aided Stanford in its ability to continue to violate Florida securities laws over a period of many years through the continued sale of the CDs.

9

34.     In short, the unlawful sales of securities could not have been made but for Pershing's participation and aid.  Pershing played a necessary and critical role in the sale of the unregistered securities, which could not have occurred but for Pershing's conduct.  Despite the numerous "red flags" related to the illegal sale of the CDs, Pershing looked the other way to preserve its lucrative stream of income from the sale of the CDs.

35.     Pershing's participation and aid in an illegal offering of unregistered securities, that it knew or should have known to be illegal, required Pershing to exercise professional expertise and judgment.

36.     In participating and aiding in an illegal offering of unregistered securities, Pershing acted beyond the scope of its ministerial and ordinary administrative functions as a clearing firm.

### Count I
### (Sale of Unregistered Securities)

37.     Plaintiff re-alleges the allegations set forth in Paragraph 1 through 36, as if fully set forth herein.

38.     This is a claim against Pershing for violations of Chapter 517 of the Florida Act arising from the sale of unregistered securities in the state of Florida.  The offers of CDs to residents of Florida violated section 517.211, Florida Statutes, which provides a private right of action for violations of section 517.07, Florida Statutes.

39.     Section 517.07 provides that "[i]t is unlawful and a violation of this chapter for any person to sell or offer to sell a security within this state" unless the security or transaction is "exempt" under Chapter 517, or unless the security is "registered pursuant to this chapter."

40.     The CDs are securities as defined in section 517.021(21), Florida Statutes.

41.     The CDs and CD transactions are not exempt from registration under the Act, nor

10

were the CDs properly registered as required.

42.     Section 517.211 renders jointly and severally liable each person making the sale "and every director, officer, partner or agent of or for the seller if the director, officer, partner or agent has personally participated or aided in making the sale."

43.     Pershing acted as an agent for the seller SIB and its affiliated entities, including SGC, and Pershing personally participated in and/or aided in the sale of CDs with knowledge that the offer was not exempt from Florida and federal registration requirements.

44.     Pursuant to section 517.211, Florida Statutes, Plaintiff and members of the class are entitled to recover recessionary damages or actual damages together with interest thereon.

WHEREFORE, Plaintiff respectfully requests judgment in their favor and against Pershing for: (a) recessionary damages; (b) compensatory damages; (c) pre-judgment interest; (d) attorneys' fees and costs pursuant to Chapter 517, Florida Statutes; and (e) such further relief as this Court deems just and proper.

### Jury Trial Demanded

Plaintiff hereby demands trial by jury.

11

DATED this the 22nd day of July, 2009.

BEASLEY HAUSER KRAMER
LEONARD & GALARDI, P.A.
505 South Flagler Drive, Suite 1500
West Palm Beach, Florida 33401
Telephone: (561) 835-0900
Facsimile: (561) 835-0939

By: _____

James W. Beasley, Jr.
Florida Bar No. 145750

-and-

Lesley Blackner, Esquire
Florida Bar No. 654043
Blackner, Stone & Associates
123 Australian Avenue
Palm Beach, FL 33480
(561)659-5754
(561)659-3184 (fax)
lblackner@aol.com

Attorneys for Plaintiffs and the Class

12